**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Maria R. Ackerson; Rita Aquina; Andrew Barten; Edward Boyce; Jude Brewer, individually and on behalf of the Estate of Marianne Brewer; Iris Cales; Theresa Caputo; John Carr; Armand L. Cipullo, individually and on behalf of the Estate of Angela Cipullo; Patricia D'Accolti; Matthew Ferber; Renee Gannon; William Gladitsch; Sara Grandison, individually and on behalf of the Estate of Geralyn Grandison; Robert Haley; Lauri Henriques; Diane Hirsch; Edyta Klimkiewicz; Regina Kreuz; William Lavin; Candace Lu; Scott Lutzer; Marie Martello; Kathleen McCarthy; Mary McDonald; Jessica McNally; Sarah Motto; Antonia Novak, individually and on behalf of the Estate of Frank Novak; Michael O'Shea; Clara Palumbo; Roxane Pandya; Maria Panno; Joseph Reid; Brian Reid; Damon Rivera; Josephine Ryan; Bonnie Scence; Lisa Sciarratta; Dana Seaman; Nicholas Sergio; John Sharrocks; Angelo V. Sottile; Ariana Tantillo; Anthony Tommasulo; Mildred Tommasulo; Frank Turrisi; Frank Verdone; Thomas Villani; Neil Wegman; Nicholas Yaniro | Civil Action No. ___19cv942___ <br><br> **NORTHROP GRUMMAN CORPORATION'S AND NORTHROP GRUMMAN SYSTEMS CORPORATION'S NOTICE OF REMOVAL** |
| Plaintiffs, | |
| -against- | |
| NORTHROP GRUMMAN CORPORATION and NORTHROP GRUMMAN SYSTEMS CORPORATION | |
| Defendants. | |

**TO THE HONORABLE JUDGES AND CLERK OF THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK:**

PLEASE TAKE NOTICE that defendants Northrop Grumman Corporation and Northrop Grumman Systems Corporation (collectively, "Northrop Grumman") hereby remove to this Court Index No. 600558/2019 currently pending before the Supreme Court of the State of New York Nassau County ("*Ackerson*") pursuant to 28 U.S.C. §§ 1332, 1441, 1442, 1446, and 1453, and respectfully state as follows:

## I.      INTRODUCTION

1.       *Ackerson* is nearly identical to two pending lawsuits filed by the same plaintiffs' counsel against Northrop Grumman that are both pending in this Court:  *Romano v. Northrop Grumman*, No. 2:16-cv-05760-DRH-ARL (removed to federal court on October 14, 2016) and *Ackerman v. Northrop Grumman*, No. 2:18-cv-04397-DRH-ARL (removed to federal court on August 2, 2018).[1]

2.       The very same claims asserted in *Ackerson* are already being litigated in this Court.  Many—if not all—of the plaintiffs in *Ackerson* are absent members of the *Romano* action's putative classes.  Further, the *Ackerson* plaintiffs appear to be asserting claims that wholly overlap with the *Romano* class claims, and are represented by the same counsel as the putative classes in *Romano*.

3.       As the *Ackerson* complaint acknowledges, *Ackerson* asserts "the same causes of action" against Northrop Grumman as are asserted in *Romano*, which has been pending in this Court for two years and in which discovery is underway.  (*See* Compl. ¶¶ 11–13 (describing *Ackerson*'s relation to *Romano*).)

4.       The *Ackerson* complaint is also a virtual copy of *Ackerman¸* which was deemed related to *Romano* because of the factual overlap in allegations and relief sought.  (*See Ackerman*, No. 2:18-cv-04397-DRH-ARL, August 30, 2018 Order Reassigning Case.)

5.       The parties overlap among the three cases.  In addition to Northrop Grumman Corporation and Northrop Grumman Systems Corporation being named as defendants in all three actions, one of the *Ackerson* plaintiffs is also a plaintiff in *Ackerman*, and some of the *Ackerson*

---

[1] The *Ackerson* complaint was served on Northrop Grumman on January 17, 2019.  A copy of the *Ackerson* complaint is included within **Exhibit A** ("Compl.").

plaintiffs reside at the same addresses and have the same surnames as plaintiffs in *Ackerman*, suggesting that they are related and may share factually overlapping claims.

6.      The *Ackerson* complaint also requests the same relief sought in both *Romano* and *Ackerman*.  The *Romano* complaint already has been amended twice.

7.      A substantial saving of judicial resources—including guarding against the risk of conflicting decisions—is likely to result from assigning *Ackerson* to the Honorable Judge Denis R. Hurley and the Honorable Magistrate Judge Arlene R. Lindsay, who currently are presiding over both *Romano* and *Ackerman*.  In accordance with Local Rule 50.3.1(d), Northrop Grumman has met and conferred with plaintiffs who agree that this case is related to *Romano* and *Ackerman*, and Northrop Grumman will file an appropriate letter application with the Clerk of the Court for a determination of relatedness.

8.      Plaintiffs' state court filing suggest a strategy to force Northrop Grumman to litigate *identical claims* on two fronts and is not the first time Plaintiffs' counsel have engaged in forum shopping.  *See Romano v. Northrop Grumman Corp.*, No. CV 16-5760(DRH), 2017 WL 6459458, at *5 (E.D.N.Y. Dec. 15, 2017) (plaintiffs' procedural tactics "g[ave] rise to a strong suggestion of forum shopping").  It should not be permitted.  As described below, the multiple bases for federal jurisdiction—including the federal officer removal statute and the Class Action Fairness Act—mean the *Ackerson* action belongs in federal court.

## II.      BACKGROUND

9.      Each of the plaintiffs asserts personal injuries and property damages, allegedly relating to the alleged release of hazardous substances occurring on an "area formerly known as the Grumman Aerospace-Bethpage Facility Site, including the Northrop Grumman – Bethpage Facility, the Naval Weapons Industrial Reserve Plant – Bethpage ('NWIRP'), and the Grumman

Steel Los Site," and an adjacent parcel of land that today is the Bethpage Community Park. (Compl. ¶¶ 2–4.)  For ease of reference, this Notice of Removal shall refer to this area, including the property once owned by the U.S. Navy on which NWIRP was located, as "the Bethpage Site."  (*See* Compl. ¶ 4.)  Plaintiffs generally allege that substances released at the Site (primarily trichloroethylene ("TCE") and its breakdown products) have migrated from groundwater plumes that are in many cases hundreds of feet below the ground surface up to their properties, that they were exposed to these substances at levels that could have caused them injury, and that they were in fact injured by that alleged exposure.

10.     From at least the 1940s through the 1990s, Northrop Grumman and its predecessor Grumman Corporation ran government-owned contractor-operated plants at its manufacturing facility in Bethpage, New York.  (Compl. ¶¶ 5–7.)  During World War II, the company produced thousands of combat aircraft for the U.S. Navy that were instrumental in winning the war in the Pacific.  (Compl. ¶ 7.)  The company continued to produce state-of-the-art military aircraft for the Navy through the Korean War and Cold War, and also designed and built the Apollo lunar module, which landed Neil Armstrong and other astronauts on the moon. (Compl. ¶ 373.)  In carrying out these activities, Northrop Grumman acted in accordance with Navy and other government agency contracts and directions and complied with industry and regulatory standards.

11.     In 1983, the New York State Department of Environmental Conservation ("NYSDEC") listed the Bethpage Site in the Registry of Inactive Hazardous Waste Disposal Sites.  (Compl. ¶ 409.)  For at least the past three decades, Northrop Grumman has worked closely with NYSDEC, the New York State Department of Health ("NYSDOH"), the Navy, and other federal, state, and local regulatory agencies to address environmental conditions relating to

the Bethpage Site.  (Compl. ¶¶ 409–420.)  As part of its comprehensive response to these environmental conditions,  Northrop Grumman has entered into three consent orders with NYSDEC, is fully implementing its obligations under those orders, and continues to conduct investigation and remediation activities under NYSDEC's continuing oversight.  (Compl. ¶¶ 421–433.)  NYSDEC has concluded that Northrop Grumman's extensive efforts protect human health and the environment, and comply with federal, state, and local requirements.  And no plaintiff in the three cases related to *Ackerson* has produced a scintilla of evidence to the contrary:  the results of soil and soil vapor testing performed by the putative class representatives in *Romano* on their own properties reveal *no detections* of PCBs, or TCE or its breakdown products—the primary constituent hazardous substances in the plumes.

12.     In June 2018, as part of its second annual report under the The Water Infrastructure Improvements for the Nation Act (the "WIIN Act"), the Navy reported to Congress for the second time that remediation efforts underway in Bethpage, in which the Navy actively participates, are effective, in compliance with federal and state law, remain "currently protective of human health and the environment," and that drinking water in the Bethpage area remains safe to drink.  The Navy as well as New York State Department of Environmental Conservation records of decision have all concluded that "the water distributed to the community is monitored on a routine basis to ensure that it meets the requirements of the [New York State Department of Health's non-detect standards].  As a result of this treatment and monitoring, an ingestion pathway does not exist . . . ."  (N.Y. Dep't of Environmental Conservation Record of Decision, Grumman Aerospace Bethpage Facility, Operable Unit 1, Site No. 130003A (March 1995) at BETPRK000010.)  The Bethpage Water District ("BWD") has also extensively

5

documented investigation and remediation of water quality among its wells, and repeatedly reaffirmed that the water is safe to drink.

13.     Just as in *Romano* and *Ackerman*, the *Ackerson* plaintiffs: (a)  assert personal injury and property damage claims allegedly caused by releases of hazardous substances in the area surrounding the Bethpage Site due to Northrop Grumman's manufacturing operations performed under "significant" contracts with and at the direction of the U.S. Navy.  (*See, e.g.*, Compl. ¶¶ 7–8, 389–390.); and (b) claim that their alleged injuries resulted from the allegedly improper remediation Northrop Grumman and the Navy have been performing under NYSDEC's oversight and approval.  (*See, e.g.*, Compl. ¶¶ 449–450.)

14.     Plaintiffs assert causes of action against Northrop Grumman for negligence, common law strict liability, nuisance, and trespass.  (*See* Compl. ¶¶ 477–515.)  These are the same causes of action asserted in the *Romano* and *Ackerman* matters.  (*See* Compl. ¶¶ 11–13.)

15.     The *Ackerson* complaint seeks damages for at least 50 plaintiffs.  While the *Ackerson* complaint is silent on the specific amount of damages the plaintiffs seek, "a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold."  *Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S. Ct. 547, 554 (2014).  A explained further below, without conceding any merit to plaintiffs' allegations or causes of action, the amount in controversy satisfies the $75,000 jurisdictional threshold under 28 U.S.C. § 1332(a) and the $5,000,000 jurisdictional threshold under § 1332(d).

16.     Accordingly, Northrop Grumman hereby removes *Ackerson* to this Court under 28 U.S.C. §§ 1442(a)(1), 1441(a), and 1453.

6

## III.   REMOVAL IS APPROPRIATE PURSUANT TO 28 U.S.C. § 1442(a)(1).

17.   This Court has jurisdiction over *Ackerson* pursuant to 28 U.S.C. § 1442(a)(1), the federal-officer removal statute.  To remove under § 1442(a)(1), the removing party must allege in its removal notice that: (1) it is a "person" within the meaning of the federal officer removal statute; (2) it was acting under the direction of a federal officer; (3) the suit is for or relates to any act performed "under color of [federal] office"; and (4) it can raise a "colorable" federal defense. *See, e.g.*, *Gordon v. Air & Liquid Sys. Corp.*, 990 F. Supp. 2d 311, 317 (E.D.N.Y. 2014) (citing *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 135 (2d Cir. 2008)).  Northrop Grumman satisfies each of these elements.

### A.   Northrop Grumman Is a "Person."

18.   "The Second Circuit has previously held that corporate entities like [Northrop Grumman] are 'person[s]' under § 1442." *Gordon*, 990 F. Supp. 2d at 317 (citing *In re Methyl Tertiary Butyl Esther Prods. Liab. Litig.*, 488 F.3d 112, 124 (2d Cir. 2007)).

### B.   Northrop Grumman Was "Acting Under" the Direction of a Federal Officer.

19.   "The words 'acting under' are to be interpreted broadly, and the statute as a whole must be liberally construed." *Isaacson*, 517 F.3d at 136 (citing *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007)).

20.   An entity "acts under" a federal officer when it "assists, or helps carry out, the duties or tasks of the federal superior." *Id.* at 137 (citations, alterations, & quotations omitted). A private contractor such as Northrop Grumman thus "acts under" a federal officer when it "help[s] the Government to produce an item that it needs." *Id.* (citation omitted).  Indeed, "[t]he assistance that private contractors provide federal officers goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks . . . [such as] providing the

7

Government with a product that it used to help conduct a war." *Id.* (citation omitted); *see also Depascale v. Sylvania Elec. Prods., Inc.*, 584 F. Supp. 2d 522, 526 (E.D.N.Y. 2008) (same).

21.     Here, plaintiffs allege that Northrop Grumman's operations at the Bethpage Site were performed at the U.S. Navy's direction to build "airplane[s], weapons and satellite[s]" through Northrop Grumman's many "significant U.S. Department of Defense contracts." (Compl. ¶ 7.)  Northrop Grumman's activities at the Bethpage Site to assist the U.S. Navy to manufacture needed products thus satisfies the "acting under" prong of the federal officer removal statute.  *See, e.g.*, *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012) ("Here, [the defendant contractor] worked hand-in-hand with the government, assisting the federal government in building warships.  'Acting under' covers situations, like this one, where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete.").

**C.      Plaintiffs Seek to Hold Northrop Grumman Liable for Actions Taken "Under Color of Federal Office."**

22.     To meet the "under color" prong, private contractors such as Northrop Grumman "must demonstrate that the acts for which they are being sued . . . occurred *because of* what they were asked to do by the Government.  [Courts] credit Defendants' theory of the case when determining whether a causal connection exists." *Isaacson*, 517 F.3d at 137 (citing *Jefferson Cty. v. Acker*, 527 U.S. 423, 432 (1999)).  "This has been referred to as a causation requirement, requiring a showing that the case arises out of the acts done under federal authority." *Depascale*, 584 F. Supp. 2d at 526.

23.     "The hurdle erected by this requirement is quite low . . . ." *Isaacson*, 517 F.3d at 137.  In fact, in 2011, Congress amended § 1442(a)(1) to cover actions "for *or relating to* any act under color of [federal] office," adding the words "or relating to."  Removal Clarification Act of

8

2011, Pub. L. No. 112–51, 125 Stat. 545.  This new language "broaden[ed] the universe of acts" that enable federal removal, H.R. Rep. 112–17, 6, 2011 U.S.C.C.A.N. 420, 425, such that there need be only "'a *connection or association* between the act in question and the federal office.'" *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 813 (3d Cir. 2016) (citing *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Phila.*, 790 F. 3d 457, 466 (3d Cir. 2015).  This amendment reinforced the policy favoring resolution in federal court of claims involving federal interests.  *See Willingham v. Morgan*, 395 U.S. 402, 407 (1969) ("[O]ne of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court.").

24.     Here there is sufficient connection or association between plaintiffs' allegations and the federal government, because Plaintiffs seek to hold Northrop Grumman liable for contamination allegedly resulting from Northrop Grumman's actions taken at the direction of the U.S. Navy.  (*See, e.g.*, Compl. ¶¶ 5, 7–8 ("During several decades while it operated at the Site, Grumman, an airplane, weapons and satellite manufacturer with significant U.S. Department of Defense contracts, generated, stored, and disposed of toxic contaminants and manufacturing byproducts . . . .  These practices resulted in extensive pollution at the Site and contaminated off-Site soils, air, groundwater and drinking water supplies in the area, causing Plaintiffs' injuries.").)

25.     Navy-approved specifications controlled Grumman's manufacturing processes, and unilaterally imposed requirements for the use of TCE and other industrial chemicals.  The Navy also exercised control over facilities Grumman used in production at Bethpage, including waste treatment infrastructure.  Indeed, the Navy itself owned many of the Bethpage facilities and prohibited Grumman from altering them without Navy approval.  The Navy could, and did,

veto Grumman's proposals for expanding waste treatment facilities at Bethpage.  And the Navy directed and oversaw some of Grumman's environmental remediation efforts at Bethpage, pursuant to Navy direction issued under one or more federal contracts.

26.    Plaintiffs' allegations regarding contamination at the Bethpage Site, therefore, satisfy the "under color" prong.  *See, e.g.*, *Isaacson*, 517 F.3d at 138 ("The action that Plaintiffs challenge, the production of dioxin, naturally would have occurred during the performance of these government-specified duties.  And even if Plaintiffs were to prove that the dioxin contamination occurred because of an act not specifically contemplated by the government contract, it is enough that the contracts gave rise to the contamination.  Indeed, whether the challenged act was outside the scope of Defendants' official duties, or whether it was specifically directed by the federal Government, is one for the federal—not state—courts to answer.").

**D.    Northrop Grumman Asserts a "Colorable" Federal Defense.**

27.    "Courts have imposed few limitations on what qualifies as a colorable federal defense."  *Isaacson*, 517 F.3d at 138.  A colorable federal defense is one based in federal law, arising from the defendant's compliance with a federal officer.  *See Arizona v. Manypenny*, 451 U.S. 232, 241 (1981).  The defense need not be ultimately meritorious, only "colorable."  *See, e.g.*, *Willingham v. Morgan*, 395 U.S. 402, 406–07 (1969) (a party need only have a "colorable [federal] defense" and "need not win [the] case before [the party] can have it removed"); *Isaacson*, 517 F.3d at 139 ("To be 'colorable,' the defense need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity of the defense will be tried in federal court.") (citation omitted).

28.    Plaintiffs allege that their injuries were caused as a result of Northrop Grumman's contractually mandated activities performed at the U.S. Navy's direction.  (*See* Compl. ¶ 7–8.) Northrop Grumman may thus assert the government contractor defense as originally set forth in

*Boyle v. United Technologies Corp.*, 487 U.S. 500, 507 (1988).  *See, e.g.*, *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 88 (2d Cir. 2008) (government contractor defense "protects government contractors from the specter of liability when the operation of state tort law would significantly conflict with the government's contracting interest").

29.     The Second Circuit has held that, in circumstances such as these where the claimed injuries are alleged to have resulted from actions undertaken pursuant to a defense department contract, the government contractor defense satisfies the "colorable" prong of the federal officer removal statute.  *See Isaacson*, 517 F.3d at 139 ("The government contractor defense, which is a creature of federal common law and serves to protect the interests of the Government rather than the contractor defendant is 'defensive' and 'federal.'  Moreover, as asserted by Defendants in this case, the defense clearly arose out of Defendants' duty pursuant to their contractual relationship with the Federal Government.  And as found by the district court, Defendants' assertions satisfy the particular requirements of the defense.") (citations, alterations, quotations omitted).

30.     Moreover, Northrop Grumman may assert immunity under § 707 of the Defense Production Act of 1950 ("DPA").[2]  *See* 50 U.S.C. § 2061 *et seq.*  Section 707 of the DPA immunizes defense contractors from liabilities stemming from the performance of contracts for the Department of Defense.  *See, e.g.*, *Ryan v. Dow Chem. Co.*, 781 F. Supp. 934, 945 (E.D.N.Y. 1992).  In pertinent part, the DPA states that "[n]o person shall be held liable for damages or

---

[2] The DPA expired by its own terms in 1990, but still immunizes defense contractors for alleged liability stemming from qualifying "rated orders" with the Department of Defense.  *See, e.g.*, *Kuwait Pearls Catering Co., WLL v. Kellogg Brown & Root Servs., Inc.*, No. Civ. A. H-15-0754, 2016 WL 1259518, at *9, 14 (S.D. Tex. Mar. 31, 2016), *vacated on other grounds*, 853 F.3d 173 (5th Cir. 2017).

ny-1359403

penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this Act . . . ."  50 U.S.C. § 2157.

31.     As stated above, plaintiffs allege that their injuries were caused as a result of Northrop Gruman's contractually mandated activities performed at the U.S. Navy's direction. (*See* Compl. ¶ 7–8.)  In fact, at least some of these contracts with the U.S. Navy were "rated orders" issued under the DPA.  Thus, for any liability stemming from these contracts, Northrop Gruman has immunity under § 707 of the DPA.  This Court has previously found that § 707 of the DPA satisfies the "colorable" prong of the federal officer removal statute.  *See Ryan*, 781 F. Supp. at 945 ("The defendants make out a colorable claim to the protection of section 707.").

32.     Further, plaintiffs' claims also directly implicate as a colorable federal defense Northrop Gruman's qualified immunity as a government contractor.  Under this doctrine, contractors can be immune from suits that challenge their actions performed pursuant to a federal government contract.  *See Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672–74 (2016); *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 20–21 (1940); *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 205–07 (5th Cir. 2009); *Mangold v. Analytics Servs., Inc.*, 77 F.3d 1442, 1447–48 (4th Cir. 1996).  In *Yearsley*, the Supreme Court held that a government contractor could not be held liable for property damages caused by work supervised by the Army Corps of Engineers because the work "was all authorized and directed" by the Government and "there is no liability on the part of the contractor for executing [the Government's] will."  309 U.S. at 20–21.

33.     The Supreme Court recently reaffirmed the continued vitality of *Yearsley* in *Campbell-Ewald*.  Therein, the Supreme Court confirmed that government contractors have qualified immunity from suit, absent a showing that they violated clearly established federal requirements or directions.  *See also Filarsky v. Delia*, 132 S. Ct. 1657, 1667–68 (2012) (a

12

private contractor retained by the government to carry out its work is entitled to share the government's immunity from suit).  The Fifth Circuit in *Bean Dredging*, citing *Yearsley*, has held that contractors could not be held liable for alleged environmental damages caused by their dredging activities performed pursuant to federal government contracts.  *Bean Dredging*, 589 F.3d at 205–07.  Similarly, in *Lamb v. Martin Marietta Energy Systems, Inc.*, a district court applied derivative sovereign immunity to a government contractor that was alleged to have contaminated groundwater through its operation of a government-owned plant, holding that strict liability claims against the contractor—like those plaintiffs assert against Northrop Grumman— would "thwart the government's retained immunity" and were barred under the Federal Tort Claims Act.  835 F. Supp. 959, 960–61 (W.D. Ky. 1993).

34.     Here, Northrop Grumman is immune from liability because the alleged acts giving rise to plaintiffs' claims were performed pursuant to valid federal contracts and at the direction of the United States.  Plaintiffs have not alleged that Northrop Grumman failed to comply with any explicit, clearly established federal directives.  This is a classic example of a contractor performing work in accordance with a federal government contract "authorized and directed" by the United States.  *See Yearsley*, 309 U.S. at 20–21; *see also Kuwait Pearls*, 2016 WL 1259518, at *11 (denying plaintiffs' motion to remand because, among other reasons, defendant "satisfied the third element for federal officer removal, assertion of colorable federal defenses, in its factual allegations supporting derivative sovereign immunity").

35.     Because Northrop Grumman satisfied each of the four elements necessary to support removal under 28 U.S.C. § 1442(a)(1), removal to this Court is appropriate.  *See, e.g.*, *Depascale*, 584 F. Supp. 2d at 528 (denying motion to remand a case removed on federal officer grounds where the plaintiffs alleged that they were exposed to various chemicals and solvents

13

discharged by the defendants to ground and water as a result of processes employed by the defendants during the manufacturing of fuel rods for the federal government).

## IV.    REMOVAL IS PROPER PURSUANT TO 28 U.S.C. § 1441(a).

36.    This Court also has original jurisdiction pursuant to 28 U.S.C. § 1332, because this is a civil action between citizens of different States and in which the amount in controversy exceeds $75,000, exclusive of costs and interest.

### A.    Diversity of Citizenship

37.    Defendants Northrop Grumman Corporation and Northrop Grumman Systems Corporation are corporations organized under the laws of the State of Delaware with their principal places of business in Falls Church, Virginia.  (Compl. ¶¶ 315, 317.)

38.    Forty-nine of the fifty plaintiffs in this action are completely diverse from Northrop Grumman. (As discussed in the next section, the claims of the fiftieth plaintiff have been fraudulently joined.)

39.    Plaintiff Maria R. Ackerson is a resident of Babylon, New York.  (Compl. ¶ 28.)

40.    Plaintiff Rita Aquina is a resident of North Massapequa, New York. (Compl. ¶ 34.)

41.    Plaintiff Andrew Barten is a resident of Plainview, New York.  (Compl. ¶ 40.)

42.    Plaintiff Edward Boyce is a resident of Clayton, North Carolina.  (Compl. ¶ 46.)

43.    Plaintiff Jude Brewer is a resident of Bethpage, New York.  (Compl. ¶ 52.)

44.    Plaintiff Iris Cales is a resident of Hicksville, New York.  (Compl. ¶ 62.)

45.    Plaintiff Theresa Caputo is a resident of Bethpage, New York.  (Compl. ¶ 68.)

46.    Plaintiff John Carr is a resident of Levittown, New York.  (Compl. ¶ 73.)

47.    Plaintiff Armand L. Cipullo is a resident of Bethpage, New York.  (Compl. ¶ 78.)

48.    Plaintiff Patricia D'Accolti is a resident of Seaford, New York.  (Compl. ¶ 88.)

49.     Plaintiff Matthew Ferber is a resident of Levittown, New York.  (Compl. ¶ 94.)

50.     Plaintiff Renee Gannon is a resident of Kings Park, New York.  (Compl. ¶ 99.)

51.     Plaintiff William Gladitsch is a resident of Bethpage, New York.  (Compl. ¶ 105.)

52.     Plaintiff Sara Grandison is a resident of Bethpage, New York.  (Compl. ¶ 110.)

53.     Plaintiff Robert Haley is a resident of Hicksville, New York.  (Compl. ¶ 117.)

54.     Plaintiff Lauri Henriques is a resident of Stony Brook, New York.

(Compl. ¶ 123.)

55.     Plaintiff Diane Hirsch is a resident of Coconut Creek, Florida.  (Compl. ¶ 129.)

56.     Plaintiff Edyta Klimkiewicz is a resident of Bethpage, New York.

(Compl. ¶ 135.)

57.     Plaintiff Regina Kreuz is a resident of Farmingdale, New York.  (Compl. ¶ 140.)

58.     Plaintiff William Lavin is a resident of Bethpage, New York.  (Compl. ¶ 145.)

59.     Plaintiff Candace Lu is a resident of West Islip, New York.  (Compl. ¶ 151.)

60.     Plaintiff Scott Lutzer is a resident of Allentown, Pennsylvania.  (Compl. ¶ 157.)

61.     Plaintiff Kathleen McCarthy is a resident of North Massapequa, New York.

(Compl. ¶ 169.)

62.     Plaintiff Mary McDonald is a resident of Bethpage, New York.  (Compl. ¶ 174.)

63.     Plaintiff Jessica McNally is a resident of Bethpage, New York.  (Compl. ¶ 179.)

64.     Plaintiff Sarah Motto is a resident of Bethpage, New York.  (Compl. ¶ 184.)

65.     Plaintiff Antonia Novak is a resident of Bethpage, New York.  (Compl. ¶ 189.)

66.     Plaintiff Michael O'Shea is a resident of Bethpage, New York.  (Compl. ¶ 198.)

67.     Plaintiff Clara Palumbo is a resident of Bethpage, New York.  (Compl. ¶ 204.)

68.     Plaintiff Roxane Pandya is a resident of Hicksville, New York.  (Compl. ¶ 209.)

69.     Plaintiff Maria Panno is a resident of Bethpage, New York.  (Compl. ¶ 214.)

70.     Plaintiff Joseph Reid is a resident of Bethpage, New York.  (Compl. ¶ 219.)

71.     Plaintiff Brian Reid is a resident of Holbrook, New York.  (Compl. ¶ 225.)

72.     Plaintiff Damon Rivera is a resident of Bethpage, New York.  (Compl. ¶ 231.)

73.     Plaintiff Josephine Ryan is a resident of Bethpage, New York.  (Compl. ¶ 236.)

74.     Plaintiff Bonnie Scence is a resident of Levittown, New York.  (Compl. ¶ 241.)

75.     Plaintiff Lisa Sciarratta is a resident of Bethpage, New York.  (Compl. ¶ 246.)

76.     Plaintiff Dana Seaman is a resident of Henderson, Nevada.  (Compl. ¶ 252.)

77.     Plaintiff Nicholas Sergio is a resident of Bethpage, New York.  (Compl. ¶ 258.)

78.     Plaintiff John Sharrocks is a resident of Bethpage, New York.  (Compl. ¶ 263.)

79.     Plaintiff Angelo V. Sottile is a resident of Bethpage, New York.  (Compl. ¶ 268.)

80.     Plaintiff Ariana Tantillo is a resident of Melville, New York.  (Compl. ¶ 273.)

81.     Plaintiff Anthony Tommasulo is a resident of Levittown, New York.
(Compl. ¶ 279.)

82.     Plaintiff Mildred Tommasulo is a resident of Levittown, New York.
(Compl. ¶ 284.)

83.     Plaintiff Frank Turrisi is a resident of Bethpage, New York.  (Compl. ¶ 289.)

84.     Plaintiff Frank Verdone is a resident of Bethpage, New York.  (Compl. ¶ 294.)

85.     Plaintiff Thomas Villani is a resident of Bethpage, New York.  (Compl. ¶ 299.)

86.     Plaintiff Neil Wegman is a resident of Plainview, New York.  (Compl. ¶ 304.)

87.     Plaintiff Nicholas Yaniro is a resident of Bethpage, New York.  (Compl. ¶ 309.)

88.     Accordingly, the court unquestionably has jurisdiction over the claims of forty-
nine of the fifty plaintiffs in this action.

16

### B.      Fraudulent Joinder

89.      This Court may disregard the citizenship of the single non-diverse plaintiff Ms. Martello under the doctrine of fraudulent joinder.  "The doctrine of fraudulent joinder is meant to prevent plaintiffs from joining non-diverse parties in an effort to defeat federal jurisdiction." *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.,* 373 F.3d 296, 302 (2d Cir. 2004).

90.      Ms. Martello was joined in this action in an attempt to destroy the Court's diversity jurisdiction.  However, "a plaintiff may not defeat a federal court's diversity jurisdiction and a defendant's right of removal by merely joining as defendants parties with no real connection with the controversy," *Pampillonia v. RJR Nabisco, Inc.*, 138 F.3d 459, 460-61 (2d Cir. 1998), and Ms. Martello's citizenship can be ignored because "there is no possibility, based on the pleadings, that [Ms. Martello] can state a claim against any of the defendants" under New York law.  *Segal v. Firtash*, No. 13-CV-7818 RJS, 2014 WL 4470426, at *3 (S.D.N.Y. Sept. 9, 2014).

91.      Ms. Martello alleges that she resided at 29 Stuben Avenue in Bethpage, New York from 1975 to 1988, a property that she "owned/rented."  (Compl. ¶ 164.)  Ms. Martello claims that she "regularly spent time in the yard and ingested, inhaled and had direct dermal contact with surface and subsurface soils and materials, as well as the water and the outdoor and indoor air at the property, the Park, and the surrounding neighborhood."  (Compl. ¶ 165.)  Ms. Martello claims that her September 2016 breast cancer diagnosis was caused by "Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of hazardous substances at the Site, which contaminated [Ms. Martello's] home and the surrounding area"—even though she lived elsewhere for thirty years before allegedly being diagnosed with an illness.  (Compl. ¶¶ 166–67.)  Ms. Martello has failed entirely to allege any specific exposure to contaminants.  These vague and conclusory allegations cannot state a claim,

17

and in fact are directly contradicted by extensive, publicly reported investigations by New York local and state health authorities, which have concluded that residents could not and have not been exposed to any substances in the way Ms. Martello alleges.  This conclusion is reinforced by the total absence of TCE detections on the properties of *any* plaintiff who has come forward with test results in the existing actions, and the fact that all studies and public records, including sources expressly cited in the *Ackerson* complaint, confirm that the kind of incidental contact with the enumerated substances Ms. Martello alleges she had three decades ago does not support a plausible allegation of causation.  The complaint simply offers no factual support for a reasonable inference that the exposure Ms. Martello alleges could have caused her alleged harm.

92.     Accordingly Ms. Martello cannot state a claim against Defendants, because she fails to plausibly allege the element of causation.  Because Ms. Martello's claims would not be recognized by a New York court as a viable cause of action, the Court may disregard the citizenship of the fraudulently joined plaintiff, and this case meets the diversity requirements of 28 U.S.C. § 1332(a)(1).

### C.     Procedural Misjoinder

93.     Under the procedural misjoinder doctrine, federal diversity jurisdiction exists where diversity is destroyed only through misjoinder of parties.  *In re Propecia (Finasteride) Prod. Liab. Litig.*, No. 12-CV-2049 JG VVP, 2013 WL 3729570 (E.D.N.Y. May 17, 2013).  The procedural misjoinder doctrine applies where plaintiffs' claims are "egregious[ly]" misjoined to defeat federal jurisdiction and "have no real connection" to one another.  *Tapscott v. MS Dealer Serv. Corp.*, 77 F.3d 1353, 1360 (11th Cir. 1996), *abrogated on other grounds by Cohen v. Office Depot*, 204 F.3d 1069 (11th Cir. 2000). Federal courts throughout the country have recognized the validity of the procedural misjoinder doctrine, including in the Second Circuit. *See, e.g.*, *In re Propecia (Finasteride) Prod. Liab. Litig.*, 2013 WL 3729570; *In re Rezulin Prod.*

*Liab. Litig.*, 168 F. Supp. 2d 136 (S.D.N.Y. 2001); *see also In re Benjamin Moore & Co.*, 318 F.3d 626, 630–31 (5th Cir. 2002) (noting "the force of the *Tapscott* principle that fraudulent misjoinder of plaintiffs is no more permissible than fraudulent misjoinder of defendants to circumvent diversity jurisdiction"); *Greene v. Wyeth*, 344 F. Supp. 2d 674, 684–85 (D. Nev. 2004) ("[T]his Court agrees with the Fifth and Eleventh Circuits that the [procedural misjoinder] rule is a logical extension of the established precedent that a plaintiff may not fraudulently join a defendant in order to defeat diversity jurisdiction in federal court.") (internal citations omitted); *Grennell v. Western Southern Life Ins. Co.*, 298 F. Supp. 2d 390, 396 (S.D. W. Va. 2004) (holding that diversity jurisdiction cannot be defeated "through . . . joining nondiverse plaintiffs").[3]

94.     Here, plaintiffs have misjoined the claims of fifty individuals. While Plaintiffs allege to have lived in or near Bethpage, New York at some point within the past sixty years and complain about groundwater conditions generally in Bethpage, the facts as to what plaintiffs allegedly were exposed to, how they were allegedly exposed, the supposed time period and alleged duration of exposure, and whether any physical injury plausibly could have resulted will be unique to each and every named plaintiff. *Cf. Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 609 (1997) (explaining how uncommon questions abound in personal injury cases that do not arise from a single accident).

95.     It is precisely in cases like this one alleging different injuries that vary based on the circumstances where courts recognize procedural misjoinder. "[T]oxic tort cases involve not

---

[3] Only "[a] small minority" of district courts have refused to recognize the procedural misjoinder doctrine. *Reuter v. Medtronics, Inc.*, No. 10-3019 (WJM), 2010 WL 4628439, at *4 n.1 (D.N.J. Nov. 5, 2010).

ny-1359403

only different injuries, but 'more complicated issues of causation and exposure.'" *In re Propecia (Finasteride) Prod. Liab. Litig.*, 2013 WL 3729570 at \*7 (citation omitted).

96.     Plaintiffs do not claim to have suffered the same alleged injuries, nor do they even identify their actual cause.  Instead, the fifty plaintiffs each vaguely allege that they suffer from "significant debilitating personal injuries"[4] and they list dozens of assorted and unrelated health problems diagnosed at different points in time.  Forty-three plaintiffs allege that they have been diagnosed with one or more of twenty-one varied cancers.[5]  The remaining seven plaintiffs allegedly suffer from no cancer but other miscellaneous health issues, like tachycardia, autoimmune disorders, kidney disease, ulcerative colitis, discoid lupus, arterial fibrillation, and thyroid problems.  (Compl. ¶¶ 149, 177, 187, 202, 266, 271, 313.)

97.     The plaintiffs all have lived in different locations within and outside of Bethpage at different times and for different durations.  Some lived in the area as early as the 1950s (Compl. ¶¶ 94, 118, 158, 220); some apparently did not move there until 2015 (Compl. ¶ 68); some plaintiffs still live in the Bethpage area, while others have not lived there since 1967 (Compl. ¶ 158); some have lived there for decades (Compl. ¶¶ 73, 78, 88, 94, 105, 135, 174, 179, 184, 189, 199, 204, 258, 263, 268, 279, 284, 289, 294, 304, 310), while others have lived there for as little as four year, and developed their alleged health issues within less than a year of moving to the area (Compl. ¶ 68).

---

[4] (Compl. ¶¶ 31, 37, 43, 49, 57, 65, 70, 75, 83, 91, 96, 102, 107, 113, 120, 126, 132, 137, 142, 148, 154, 160, 166, 171, 176, 181, 186, 193, 201, 206, 211, 216, 222, 228, 233, 238, 243, 249, 255, 260, 265, 270, 276, 281, 286, 291, 296, 301, 306, 312.)

[5] (Compl. ¶¶ 32, 38, 44, 50, 58, 66, 71, 76, 84, 92, 97, 103, 108, 114, 121, 127, 133, 138, 143, 155, 161, 167, 172, 182, 194, 207, 212, 217, 223, 229, 234, 239, 244, 250, 256, 261, 277, 282, 287, 292, 297, 302, 307.)

98.     The sole non-diverse plaintiff, Marie Martello, in particular, has not resided in the Bethpage area since 1988.  (Compl. ¶ 163.)  She allegedly lived in Bethpage for only thirteen years during the 1970s and 80s, and then moved and resided elsewhere for nearly thirty years before being diagnosed with breast cancer in 2016.  (Compl. ¶¶ 164, 167.)  Her claims simply do not arise from the same alleged occurrences or series of occurrences as other plaintiffs who, for example, lived elsewhere in Bethpage during different decades, for different durations, and have been diagnosed with totally unrelated health issues at different times.  In sum, aggregating these fifty plaintiffs in a single suit to defeat diversity jurisdiction is improper.

99.     Accordingly, if this Court determines that it has no subject matter jurisdiction under the federal officer removal statute or through application of the fraudulent joinder doctrine—which it does as outlined above—it may disregard the citizenship of any non-diverse but procedurally misjoined plaintiff like Ms. Martello, and if necessary sever Ms. Martello's case and remand it back to state court while retaining jurisdiction over the remaining forty-nine plaintiffs who *are* diverse from Northrop Grumman.  *See In re Propecia*, 2013 WL 3729570, at *8 ("[T]he fraudulent misjoinder doctrine can be applied to sever and remand non-diverse claims . . . .").

**D.     Amount in Controversy**

100.    Although Northrop Grumman denies all of plaintiffs' claims, the amount in controversy satisfies the jurisdictional threshold for removal.  Each plaintiff seeks a comprehensive list of damages including compensatory damages for the costs of past and future medical expenses, compensation for alleged physical injuries and mental anguish, lost income, alleged devaluation of property and costs of property repair or restoration, as well as an unspecified amount of punitive damages.  (Compl. ¶¶ 476, 483, 499, 500, 514, 519.)  While plaintiffs have not specified a claimed amount, in *Romano*—which, as the *Ackerson* complaint

21

acknowledges, asserts "the same causes of action" against Northrop Grumman on behalf of some of the same plaintiffs—plaintiffs sought many multiples of the threshold amount.  (*See* Compl. ¶¶ 11–13; Second Amended Complaint at pp. 63–65, *Romano v. Northrop Grumman*, No. 2:16-cv-05760-DRH-ARL, May 4, 2018 (ECF No. 34) (prayer for relief).)

101.    Accordingly, Northrop Grumman plausibly can allege that plaintiffs' request for monetary damages exceeds the $75,000 amount-in-controversy requirement of 28 U.S.C. § 1332(a).  *See Dart Cherokee Basin Operating Co., LLC*, 135 S. Ct. at 554 ("notice of removal need include only a plausible allegation").

## V.    REMOVAL BASED UPON THE CLASS ACTION FAIRNESS ACT, 28 U.S.C. §§ 1332(d) and 1453.

102.    In the alternative, this Court also has jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).  As detailed below, this case is (1) a proposed class action within the meaning of CAFA, in which (2) "any member of a class of plaintiffs is a citizen of a State different from any defendant," (3) the "number of members of all proposed plaintiff classes in the aggregate is [not] less than 100," and (4) "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs." *See* 28 U.S.C. § 1332(d)(2)(A), (d)(5)(B), (d)(6).

103.    CAFA defines a "class action" to include any "mass action." *Id.* § 1332(d)(11)(a). A "mass action" is any civil action "in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact." *Id.* § 1332(d)(11)(B)(i).

104.    Congress, when it passed CAFA, emphasized that a complaint may be removed even when the pleading is not denominated as a class action.  *See* S. Rep. No. 109-14, p. 35 (2005).  Section 1332(d)(1)(B)'s definition of a "class action" must be "interpreted liberally,"

and "lawsuits that resemble a purported class action should be considered class actions for the purpose of applying these provisions." *Id.* In other words, because CAFA is intended to prevent parties from "gam[ing] the procedural rules," *id*. at 5, the court must look to the substance of the complaint and not only at its label.

      **A.**      **This case is a "mass action" under 28 U.S.C. § 1332(d)(11).**

     105.    The *Ackerson* and *Ackerman* complaints were filed in New York State Court within six months of one another, and both were modeled closely upon the complaint in *Romano*. The *Romano*, *Ackerman*, and *Ackerson* suits all involve similar personal injury and property damage claims, which arise from the same events in the same geographic area, which are founded upon similar theories of causation and harm. Northrop Grumman Corporation and Northrop Grumman Systems Corporation are named as defendants in all three actions. There are 28 Plaintiffs in *Romano*, 72 Plaintiffs in *Ackerman*, and 50 in *Ackerson*, for a total of 150 Plaintiffs (including four duplicates outlined above).

     106.    Plaintiffs' own affirmative actions indicate their intent to try all three actions jointly. *See Scimone v. Carnival Corp.*, 720 F.3d 876, 881 (11th Cir. 2013) ("[P]laintiffs can propose a joint trial, either by naming 100 or more plaintiffs in a single complaint or by their litigation conduct at any time prior to defendants' removal of their action to federal court."). The plaintiffs are all represented by the same law firm, which sent the same solicitation in 2015 to all plaintiffs to join litigation arising from alleged contamination in Bethpage. (Napoli Shklonik PLLC, "Harmful Levels of Toxic Chemicals in Bethpage Yard Soil," dated July 1, 2015 (available at https://www.napolilaw.com/article/harmful-levels-of-toxic-chemicals-in-bethpage-yard-soil/).) Plaintiffs then made an affirmative, voluntary, and intentional decision to file three coordinated, near-identical suits in the New York State Court. *See Briggs v. Merck Sharp & Dohme*, 796 F.3d 1038, 1048 (9th Cir. 2015) ("A proposal for purposes of CAFA's

mass action jurisdiction, even an implicit proposal, is a 'voluntary and affirmative act,' and an 'intentional act.'")(citation omitted).  In fact, Plaintiffs named three of the same plaintiffs—Mr. Glenn Falino, Mr. Daniel Gallante, and Ms. Jackie Lieberman—in both the *Romano* and *Ackerman* actions.  Plaintiffs also named Ms. Renee Gannon in both *Ackerson* and *Ackerman*. These claims appear to be duplicative.  At least one other plaintiff in *Ackerson* shares a surname and address with an *Ackerman* plaintiff, and other plaintiffs in *Ackerman* share surnames and addresses with *Romano* plaintiffs, suggesting that they are related and have resided in the same household, and that there may be additional factual overlap that will have to be explored.

107.   *Ackerson, Ackerman,* and *Romano* are more than simply related:  they appear to propose to try the very same claims.  *Romano* purports to assert class claims on behalf of "all residents" and "all owners of real property in" Bethpage, and many if not all of the *Ackerman* and *Ackerson* plaintiffs would be members of the putative classes the *Romano* complaint describes, asserting the same claims proposed to be tried on behalf of the classes there, and represented by the very same putative class counsel.

108.   Plaintiffs could not have intended to try the same claims by the same plaintiffs multiple times across three separate trials.  Thus, by filing nearly identical, coordinated complaints in New York State Court within the past six months, Plaintiffs have proposed to try the claims of more than 100 plaintiffs jointly, and this case meets the definition of a mass action removable under CAFA.

**B.    CAFA's numerosity requirement is satisfied.**

109.   This is not an action in which the "number of members of all proposed plaintiff classes in the aggregate is less than 100," 28 U.S.C. § 1332(d)(5)(B), because there are 146 named plaintiffs in the mass action described above.

**C.     CAFA's minimal diversity requirement is satisfied.**

110.    CAFA applies to all proposed class actions where the parties are "minimally diverse," meaning that "any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A). The minimal-diversity requirement is met here because Northrop Grumman is diverse from 145 out of 146 plaintiffs.

**D.     CAFA's amount-in-controversy requirement is satisfied.**

111.    For jurisdiction to exist under CAFA, "the matter in controversy [must] exceed[] the sum or value of $5,000,000, exclusive of interest and costs." 28 U.S.C. § 1332(d)(2). "In any class action, the claims of the individual class members shall be aggregated to determine whether the matter in controversy" meets the $5,000,000 threshold. *Id*. § 1332(d)(6).

112.    This threshold is satisfied, as outlined above (*supra* paragraphs 100–101), because each plaintiff seeks a comprehensive list of damages including compensatory damages for the costs of past and future medical expenses, compensation for alleged physical injuries and mental anguish, lost income, alleged devaluation of property and costs of property repair or restoration, as well as an unspecified amount of punitive damages.  Even though plaintiffs have not specified a claimed amount, in *Romano*—which, as the Ackerson complaint acknowledges, asserts "the same causes of action" against Northrop Grumman on behalf of some of the same plaintiffs— plaintiffs sought more than $100,000,000, many multiples of the jurisdictional threshold. Accordingly, Northrop Grumman plausibly alleges that plaintiffs' request for monetary damages exceeds the $5,000,000 amount-in-controversy requirement.

113.    Because Northrop Grumman has satisfied each of CAFA's jurisdictional requirements, the *Ackerson* complaint may be removed to this Court under CAFA, as well.

## VI. NORTHROP GRUMMAN SATISFIES THE PROCEDURAL REQUIREMENTS FOR REMOVAL.

114. Removal is timely under 28 U.S.C. § 1446(b) because Northrop Grumman is removing *Ackerson* within 30 days of being served with the *Ackerson* complaint.

115. Venue is proper under 28 U.S.C. § 1442(a) because this Court is the United States District Court for the district and division embracing the place where *Ackerson* was pending.

116. Pursuant to 28 U.S.C. § 1446(a), a copy of all process, pleadings and orders in *Ackerson*, which include the summons and complaint, are attached hereto as **Exhibit A**.

117. A copy of the written notice required by 28 U.S.C. § 1446(d) is attached as **Exhibit B**. This notice will be promptly provided to the Clerk of the Supreme Court of the State of New York, Nassau County and served on plaintiffs.

**WHEREFORE**, Northrop Grumman respectfully requests that the above-titled action now pending against it in the Supreme Court of the State of New York Nassau County be removed to this Court.

Dated: February 15, 2019

Frank Leone (*of counsel*)
Mark A. Miller (*of counsel*)
HOLLINGSWORTH LLP
1350 I Street, N.W.
Washington, D.C. 20005
Telephone: (202) 898-5800
Facsimile: (202) 682-1639
fleone@hollingsworthllp.com

_/s/ Grant J. Esposito_
Grant J. Esposito
Jessica Kaufman
Katie L. Viggiani
Robert J. Baehr
MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
gesposito@mofo.com
jkaufman@mofo.com
kviggiani@mofo.com
rbaehr@mofo.com

*Attorneys for Defendants Northrop Grumman Corporation and Northrop Grumman Systems Corporation*

ny-1359403

## CERTIFICATE OF SERVICE

I certify that, on February 15, 2019, a true and accurate copy of the foregoing document was served upon all counsel of record by email and regular U.S. Mail, postage prepaid, and addressed to:

> Paul J. Napoli
> Lilia Factor
> Tate J. Kunkle
> Napoli Shkolnik PLLC
> 400 Broadhollow Road, Suite 305
> Melville, New York 11747
> pnapoli@napolilaw.com
> lfactor@napolilaw.com
> tkunkle@napolilaw.com
>
> *Attorneys for Plaintiffs*

> _/s/ Jessica Kaufman_
> Grant J. Esposito
> Jessica Kaufman
> Katie L. Viggiani
> Robert J. Baehr
> MORRISON & FOERSTER LLP
> 250 West 55th Street
> New York, New York 10019
> Telephone: (212) 468-800
> Facsimile: (212) 468-7900
> gesposito@mofo.com
> jkaufman@mofo.com
> kviggiani@mofo.com
> rbaehr@mofo.com
>
> *Attorneys for Defendants Northrop*
> *Grumman Corporation and Northrop*
> *Grumman Systems Corporation*